Edward S. KANBAR and Rooney Castellon, Inc., individually and on behalf of MEDIQ Incorporated, Plaintiffs,

v.

U.S. HEALTHCARE, INC., Leonard Abramson, MEDIQ Incorporated, Eugene M. Schloss, Jr., and Alan Letofsky, Defendants.

No. 89 Civ. 1197 (JMW).

United States District Court, S.D. New York.

July 13, 1989.

Edward S. Kanbar, New York City, for plaintiffs.

Harvey Kurzweil, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, and Lawrence D. Berger, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

WALKER, District Judge:

Plaintiffs Edward S. Kanbar ("Kanbar") and Rooney Castellon, Inc. ("Castellon"), individually and derivatively on behalf of MEDIQ Incorporated ("MEDIQ"), have brought suit against defendants U.S. Healthcare, Inc. ("USH"), MEDIQ Incorporated, Leonard Abramson ("Abramson"), Eugene M. Schloss, Jr. ("Schloss"), and Alan Letofsky ("Letofsky"), alleging securities fraud, common law fraud, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). These claims arise from the merger of Family Medical Care, Inc. ("FMC") into the Health Maintenance Organization of Pennsylvania ("HMO–Pa."), the predecessor of USH.

Presently before the Court are defendants' motion for a change of venue pursuant to 28 U.S.C. §§ 1404 or 1406 and motion to dismiss under Fed.R.Civ.P. 12(b). For the reasons discussed below, the Court grants defendants' motion to transfer un-

der 28 U.S.C. § 1404. In light of this disposition, the Court need not rule on defendants' motion to dismiss.

### I. Background

In 1972, plaintiffs, both then residents of Puerto Rico, invested $50,000 in shares of FMC. Until December 1980, FMC was a subsidiary of R.H. Medical Services, Inc. ("RHM"). Both were Pennsylvania corporations with offices in a Philadelphia suburb. Business was less than healthy for the two companies, and, in the mid and late 1970s, RHM began to withdraw from the healthcare area and to sell off some of its own and its subsidiary's assets. In 1980, RHM adopted a plan of liquidation, and RHM's remaining subsidiaries, including FMC, were merged into MEDIQ, a company based in a New Jersey suburb of Philadelphia.

Defendant Abramson was the president of FMC during the 1970s. While there, he formed HMO–Pa. as a non-profit health maintenance corporation. In 1977 HMO–Pa. purchased from FMC its subscriber list of 1,250 subscribers. When FMC was merged into MEDIQ, Abramson left FMC; he now heads USH, the successor to HMO–Pa.

FMC's minority shareholders were told that the company's assets were sold to an unrelated corporation and that FMC was inactive and worthless. When FMC was merged into MEDIQ, all but two of FMC's shareholders received the nominal par value of their shares from RHM. RHM was unable to contact Kanbar and Castellon, and so they became the only two remaining shareholders in FMC.

In 1988, Kanbar, now a New York resident, discovered that Abramson had formed HMO–Pa. while he was still at FMC. Believing that FMC had intentionally sold its assets to a related company at a "distress price," Kanbar wrote to Abramson regarding the relationship between FMC, HMO–Pa., and USH. *See* P.Mem. at 2.[1] Letofsky, vice-president and general

---

1. References throughout this Memorandum are as follows: Defendants' Memorandum in Support of Motions to Transfer and to Dismiss ("D. Mem."); Plaintiffs' Memorandum in Opposition

counsel of USH, replied on behalf of Abramson and USH, and denying that FMC and USH were related companies. Kanbar Aff., Exh. B. Kanbar also wrote to Schloss, formerly Secretary of FMC and now general counsel of MEDIQ, asking him to institute legal action on behalf of FMC with regard to the 1977 sale of assets to HMO–Pa. Schloss declined Kanbar's request, Kanbar Aff., Exh. C.

Plaintiffs filed the present action in February 1989. In sum, plaintiffs allege that FMC sold its assets to HMO–Pa., a related corporation, for below their market value and that the officers of FMC and HMO–Pa (later USH) engaged in a conspiracy—including the 1988 letters from Letofsky and Schloss—to conceal this defrauding of FMC's stockholders.

Defendants now move for an order pursuant to 28 U.S.C. § 1404 transferring this action to the Eastern District of Pennsylvania. Defendants argue that such a transfer would be "[f]or the convenience of parties and witnesses [and] in the interests of justice." 28 U.S.C. § 1404(a). Defendants also claim that venue in this district is improper under 28 U.S.C. § 1391(b) since no defendant is a resident of this district and all the operative facts of the case occurred in Pennsylvania.[2] Defendants therefore seek transfer under 28 U.S.C. § 1406, which provides for transfer to an appropriate district when venue is improper.[3]

Alternatively, defendants move for dismissal pursuant to Fed.R.Civ.P. 12(b) on the grounds that: (1) plaintiffs cannot maintain a derivative action since FMC no longer exists and plaintiffs have not alleged that they are shareholders of MEDIQ; (2) plaintiffs' federal securities claims fail to state a cause of action, fail to plead fraud with particularity, and are time-barred; and (3) plaintiffs' RICO claim fails

to allege the pattern or predicate acts required by statute. In addition, defendants contend that since the federal causes of action are defective, plaintiffs' pendant claims must also be dismissed.

## II. Discussion

This case concerns several Pennsylvania-based corporations, all located near Philadelphia, engaged in allegedly fraudulent conduct; nearly all of this activity occurred in the Philadelphia area. Defendants reside in and have their principal places of business in the Philadelphia metropolitan area. The only links to the Southern District of New York are that one plaintiff has, since 1980—after most of the activity at issue occurred—become a resident of New York City, and two letters from defendants, containing allegedly fraudulent misrepresentations, were sent to that plaintiff in New York in 1988. It is not clear why this case is in this district at all. However, because we hold that transfer to the Eastern District of Pennsylvania is appropriate under 28 U.S.C. § 1404, we need not decide whether venue in this district is proper under 28 U.S.C. § 1391(b).

28 U.S.C. § 1404(a) provides: "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." There is, of course, no question that this action could have been brought originally in the Eastern District of Pennsylvania: all of the defendants are residents of that district and nearly all of the operative facts at issue took place in Pennsylvania. Still, the party seeking the transfer bears the burden on establishing, by a clear and convincing showing, the propriety of transfer. *See Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir.1978),

---

to Motions to Transfer and to Dismiss ("P. Mem."); Exhibit ("Exh."); and Affidavit ("Aff.").

**2.** 28 U.S.C. § 1391(b) provides:

A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law.

**3.** 28 U.S.C. § 1406(a) provides:

The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

*cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979); *Heyco, Inc. v. Heyman,* 636 F.Supp. 1545, 1549 (S.D.N.Y. 1986).

In reaching a determination of whether transfer is appropriate under section 1404(a), the district court has broad discretion. *See Sheet Metal Workers' National Pension Fund v. Gallagher,* 669 F.Supp. 88, 91–92 (S.D.N.Y.1987); *Heyco,* 636 F.Supp. at 1549; *Mobile Video Services, Ltd. v. National Association of Broadcast Employees and Technicians,* 574 F.Supp. 668, 670 (S.D.N.Y.1983). Factors to be balanced by a court in this inquiry include: (1) where the operative facts occurred, *Heyco,* 636 F.Supp. at 1549; (2) the location of relevant witnesses and documents, *Mobile Video,* 574 F.Supp. at 670–71; (3) the convenience of the parties, *Matra et Manurhin v. International Armament Co.,* 628 F.Supp. 1532, 1535 (S.D.N.Y.1986); (4) the applicable state law, *Calavo Growers of California v. Belgium,* 632 F.2d 963, 966–67 (2d Cir.1980), and *Copulsky v. Boruchow,* 545 F.Supp. 126, 128–29 (E.D.N.Y. 1982); (5) the plaintiff's choice of forum, *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947), and *Steinberg & Lyman v. Takacs,* 690 F.Supp. 263, 266 (S.D.N.Y.1988); and (6) the docket conditions of the transferor and transferee districts, *A. Olinick & Sons v. Dempster Brothers, Inc.,* 365 F.2d 439, 445 (2d Cir.1966); *Matra et Manurhin,* 628 F.Supp. at 1536. *See generally Eichenholtz v. Brennan,* 677 F.Supp. 198, 199–200 (S.D.N.Y.1988). Applying these factors, the Court finds that transfer is warranted in the present case.

As noted above, nearly every element of the alleged fraud and conspiracy occurred in the Eastern District of Pennsylvania. The only element alleged by plaintiff which could possibly be deemed to have occurred outside that district is the mailing of letters from Schloss and Letofsky *to* Kanbar in New York in 1988. Even if these letters are considered to be part of a continuing conspiracy, they are hardly central ele-

ments of the alleged fraudulent behavior. As in *Kolko v. Holiday Inns, Inc.,* "[t]he facts underlying this action have no material connection with the Southern District of New York." 672 F.Supp. 713, 716 (S.D.N.Y.1987).

The location of relevant witnesses also supports transfer. Although no discovery has yet been conducted, the evidence before the Court at this time strongly indicates that nearly all of the witnesses to be called at trial will be either from the Eastern District of Pennsylvania or from nearby areas. Indeed, defendants have supplied a list of twelve likely witnesses, all of whom reside in the Philadelphia area. D. Mem. at 10–11. While plaintiffs argue that such a list is "largely conjecture," P. Mem. at 11, the Court finds that it is a well-informed and likely conjecture. For the one potential witness from Puerto Rico, the Court finds that Philadelphia and New York are equally convenient.

Similarly, all of the relevant records and documents of defendant MEDIQ are located in a New Jersey suburb of Philadelphia. Documents relating to USH's purchase of certain FMC assets are in another Philadelphia suburb in Pennsylvania. While "plaintiff would agree to examine these documents in the Philadelphia area" if necessary, P. Mem. at 10, many of these records would still have to be transported to and stored in New York for trial.

The convenience of the parties also favors transfer. All of the individual and corporate defendants reside in the Eastern District of Pennsylvania and transact business within that district. Berger Aff. ¶ 7. In contrast, only one of the two plaintiffs—who also is acting as attorney for plaintiffs [4]—is in New York. Plaintiffs argue, "Philadelphia is less than 100 miles from [New York], and Amtrak covers this distance in about 1½ hours. The defendants can come to New York in the morning and be back at work in the afternoon." P. Mem. at 10. Of course, this reasoning, as

---

**4.** In light of its disposition of this case, the Court declines to rule on defendants' argument that Kanbar cannot maintain a derivative action

as both a representative plaintiff and attorney for plaintiffs. *See* D. Mem. at 22–24.

well as Amtrak's trains, goes two ways. It is patently more convenient for plaintiff Kanbar to travel to Philadelphia than to have all defendants travel to New York. As to the other plaintiff Castellon, a resident of Puerto Rico, Philadelphia is no less convenient than New York.

While it is not yet certain, it is likely that the state law issues in this litigation will be governed by Pennsylvania rather than New York law, since nearly all the alleged acts occurred in Pennsylvania. The district court for the Eastern District of Pennsylvania is in all probability more familiar with Pennsylvania law than this Court. Plaintiffs argue that a change of venue may be prejudicial to their RICO claims, since the standards for judging RICO actions is settled in the Second Circuit but not in the Third Circuit. Such considerations, even if true, are of little relevance. As the Second Circuit held in *H.L. Green Co. v. MacMahon:*

> A plaintiff may not resist the transfer of his action to another district court on the ground that the transferee court will or may interpret federal law in a manner less favorable to him.... if there is a conflict of views among circuits, "this presents a matter for consideration by the Supreme Court on application for certiorari, not for consideration by a district judge on application for transfer...." [N]o litigant has a right to have the interpretation of one federal court rather than that of another determine his case.

312 F.2d 650, 652 (2d Cir.1962) (citations omitted), *cert. denied,* 372 U.S. 928, 83 S.Ct. 876, 9 L.Ed.2d 736 (1963). *See also Scheinbart v. Certain–Teed Products Corporation,* 367 F.Supp. 707, 711 (S.D.N.Y. 1973).

While a plaintiff's choice of forum is ordinarily entitled to considerable deference, plaintiff's choice becomes less relevant where, as here, the transactions underlying the cause of action have little or no material connection to the chosen forum. *See Foster v. Litton Industries, Inc.,* 431 F.Supp. 86, 87 (S.D.N.Y.1977); *Matra et Manurhin,* 628 F.Supp. at 1532. As noted above, aside from the two 1988

letters to Kanbar—which are hardly central to plaintiffs' claim—this case has no connection with this district.

The final factor for consideration, the two districts' respective docket conditions, also argues in favor of transfer. As is well known, the Southern District of New York is the busiest judicial district in the nation. For example, the median time interval from filing to the end of trial is 22 months in this district, compared with only twelve months in the Eastern District of Pennsylvania. *Appendix I, Annual Report of the Director of the Administrative Office of the United States Courts,* Table C–5 (1988). This difference further suggests that transfer would be in "the interest of justice." To retain a case such as this which has no substantial nexus to New York would only serve to further delay adjudication of other cases brought by parties who are compelled to sue in the Southern District of New York.

### III. Conclusion

For the reasons discussed above, defendants' motion to transfer this action to the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404 is granted. In light of this disposition, the Court declines to rule on defendants' motion to dismiss.

SO ORDERED.