**AGCS MARINE INSURANCE COMPANY, Plaintiff,**

v.

**ASSOCIATED GAS & OIL COMPANY, LIMITED, et al., Defendants.**

No. 10 Civ. 6026 (VM).

United States District Court, S.D. New York.

March 28, 2011.

Donald Theodore Rave, Jr., Law Offices of Donald T. Rave, Locust Valley, NY, for Plaintiff.

Obayomi Awoyinfa, Law Offices of Yomi Awoyinfa, James H. Power, Kathryn Blythe Daly, Holland & Knight LLP, New York, NY, Kenneth Marc Klemm, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, New Orleans, LA, Martin S. Bohman, Offshore Marine, Inc., Cut Off, LA, for Defendants.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiff AGCS Marine Insurance Company ("AGCS") brought this action against defendants Associated Gas & Oil Company Ltd. ("Associated"), Offshore Marine, Inc. ("Offshore") and Smith Maritime, Inc. ("Smith Maritime," and together with Associated and Offshore, "Defendants") seeking various forms of declaratory relief with respect to a maritime cargo insurance policy (the "Cargo Policy") underwritten by AGCS. On October 20, 2010, Smith Maritime submitted a letter (the "Smith Maritime Letter") to the Court requesting a pre-motion conference regarding a proposed motion for venue transfer pursuant to 28 U.S.C. § 1404(a) ("§ 1404(a)"). Additionally, on November 1, 2010, Offshore

moved to dismiss the action for lack of personal jurisdiction, pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure ("Rule 12(b)(2)"), as well as for improper venue, pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure ("Rule 12(b)(3)"); in the alternative, Offshore sought to have this action transferred to the United States District Court for the Western District of Louisiana[1] pursuant to § 1404(a) ("Offshore's Motion").

Because the Court finds, for the reasons discussed below, that this action properly belongs in the Western District of Louisiana, the Court GRANTS Offshore's Motion in part and transfers this action to the Western District of Louisiana.

## I. BACKGROUND[2]

This globe-spanning maritime action arises out the purchase of two lift boats[3] and related equipment (the "Cargo") by Associated, a Nigerian company, from Offshore, an American company incorporated in Louisiana with its sole place of business in Louisiana. As part of the structuring of this $35.2 million transaction (the "Purchase Agreement"), Associated obtained a letter of credit ("Letter of Credit") from German bank Norddeutsche Landesbank Gironzentrale ("NORD") and financing from the Private Export Funding Corporation ("PEFCO"), headquartered in New York, New York ("New York City"). Associated also contracted with Florida company Smith Maritime to transport the Cargo (the "Transport Agreement") from Morgan City, Louisiana to Calabar, Nigeria (the "Overseas Voyage"). As a precondition for receiving the Letter of Credit and financing from NORD and PEFCO, Associated was required to obtain the Cargo Policy from AGCS, a marine insurance company incorporated in Illinois and having its principal marine underwriting office in New York City. The Cargo Policy insured the Cargo for approximately $40 million during the course of the Overseas Voyage and listed both Offshore and Smith Maritime as additional named assureds.[4]

The Purchase Agreement and the Transport Agreement closed on or about February 25, 2010 at NORD's offices in New York City. Representatives of all Defendants attended the multi-day closing, at which time Associated received title to the Cargo, Offshore received millions of dollars in cash consideration and mortgages on the lift boats, and Smith Maritime received over $2 million toward the prepaid freight pursuant to the Transport Agreement. Additionally, the bulk of the

1. Although Offshore's Notice of Motion lists the Eastern District of Louisiana as Offshore's proposed alternative venue, its memorandum of law ("Offshore Mem.") argues for transfer to the Western District of Louisiana. Consequently, the Court construes Offshore's Motion as an application for transfer to the Western District of Louisiana.

2. Except where noted otherwise, the facts below are taken from the following submissions of AGCS: the Amended Verified Complaint for Declaratory Judgment, dated August 16, 2010 (the "Amended Complaint"), and materials attached thereto; and the letter of Donald T. Rave, dated October 27, 2010 (the "AGCS Letter"), submitted in opposition to the Smith Maritime Letter. No further citation to these sources will be made, except where specifically referenced.

3. As described in the Amended Complaint, " '[l]ift boats' or 'liftboats' are barge-like, self-propelled, self-elevating vessels used in support of offshore construction or mineral production activities. They have the ability to lower 'legs' to the seabed and jack themselves up so as to form a stable work platform in relatively shallow waters." (Am. Compl. at 3 n. 1.)

4. According to Offshore's Motion, Offshore is named in the Cargo Policy due to its agreement to finance fifteen percent of the Purchase Agreement.

insurance premium for the Cargo Policy was paid at the closing, and the Defendants received confirmation from AGCS's New York-based underwriters that AGCS would issue the Cargo Policy according to the terms required by Associated. Thereafter, AGCS issued the Cargo Policy from its office in New York City.

Unfortunately, the Overseas Voyage was ill-fated. On or about April 2, 2010, the tug boat (the "Tug") hauling the barge (the "Barge," and together with the Tug, the "Flotilla") upon which the Cargo was loaded set sail from Louisiana. Less than two weeks later, the Tug encountered rough weather and seas, which resulted in damage to the Barge and the Cargo. Thus, the Flotilla diverted to St. Thomas in the U.S. Virgin Islands for temporary repairs and for the Cargo to be re-secured. On or about May 5, 2010, the Flotilla set sail again from St. Thomas to continue the voyage to Nigeria. Yet the Flotilla encountered bad weather and seas for a second time several weeks later as it approached the western coast of Africa. Coupled with alleged inherent vices and defects in the Flotilla and the Cargo, the weather conditions caused the Cargo to become unstable, and certain portions of the Cargo broke free from their lashings and fell, damaging the Cargo and the Barge. As a result of this weather, the damage to the Barge and Cargo, and the fact that the Tug was burning fuel at a higher rate than previously anticipated, the Flotilla became unseaworthy, jeopardizing the entire voyage. At that point, with the Flotilla approximately 900 miles from the Cape Verde Islands, Defendants decided to take advantage of certain favorable weather and climate conditions and directed that the Flotilla be turned around and sailed 1,700 miles back to the island of Trinidad in order for the Flotilla to be temporarily repaired, the Cargo to be restowed, and the voyage to continue to Nigeria. On or about August 8, 2010, however, Associated advised AGCS that the Flotilla would not complete its Overseas Voyage from Trinidad to Nigeria but rather would return to a shipyard in Louisiana in order for the Cargo to be repaired or replaced. The Flotilla and its Cargo returned to Morgan City, Louisiana on September 5, 2010, and they remain there to this day. (*See* Smith Maritime Letter at 1.)

Since the Flotilla's diversion to Trinidad and its subsequent return to Louisiana, conflicts have arisen among the parties with regard to the Cargo Policy. First, following the reporting of the damage to the Cargo to AGCS, Defendants, all of whom are named as assureds in the Cargo Policy, began to dispute the Cargo Policy's naming of Smith Maritime as the sole loss payee.[5] Additionally, Defendants have indicated their intention to make various claims under the Cargo Policy. While AGCS has agreed in principle to pay certain of these claims, it disputes others, including claims for "sue and labor" incurred while the Flotilla was at St. Thomas and Trinidad, as well as claims for loss, damage and expense arising from delay in the Overseas Voyage to Africa ("Demurrage Charges").[6]

---

**5.** At the conference held by the Court on January 7, 2011 to discuss these issues (the "January 7 Conference"), Smith Maritime indicated its intention to file counterclaims and/or cross-claims with respect to this loss payee issue, and consequently, Smith Maritime no longer opposes venue in this Court.

**6.** Counsel for Smith Maritime noted at the January 7 Conference that there is also a dispute between Associated and Smith Maritime currently under arbitration in Houston, Texas, concerning Smith Maritime's seizure of the Cargo as security for payments allegedly owed to it by Associated.

AGCS filed its Amended Complaint on August 16, 2010, asserting four claims for declaratory relief. Specifically, AGCS seeks declarations that (1) Associated's decision to divert the Flotilla from Trinidad to Louisiana, as opposed to continuing on to Africa, constituted abandonment of the Overseas Voyage, thereby terminating AGCS's coverage obligations under the Cargo Policy as of August 8, 2010; (2) Defendants have breached their sue and labor obligations under the Cargo Policy by (a) failing to solicit and/or obtain repair bids for the Cargo from shipyards in Africa, and (b) abandoning the Overseas Voyage through the decision to return the Flotilla to Louisiana for repairs; (3) Defendants' prospective claims for Demurrage Charges are not covered under the Cargo Policy; and (4) certain expenses incurred in Trinidad for which claims under the Cargo Policy have already been made by Smith Maritime, and may in the future be made by the other Defendants, should be shared in general average by the parties.

## II. *DISCUSSION*

### A. VENUE TRANSFER

#### 1. *Legal Standard*

Pursuant to 28 U.S.C. § 1391(b) ("§ 1391(b)"), a civil action such as this one wherein jurisdiction is not founded solely on diversity of citizenship may ... be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

§ 1391(b). For the purposes of this determination, domestic corporate defendants are "deemed to reside in any judicial district" in which they are "subject to personal jurisdiction at the time the action is commenced," 28 U.S.C. § 1391(c). A foreign corporation may be sued in any district. *See id.* § 1391(d).

Even if the § 1391(b) venue requirements are satisfied, pursuant to § 1404(a), "[f]or the convenience of the parties and witnesses, in the interest of justice," a court may transfer a civil action to any district where the action "might have originally been brought." § 1404(a). Deciding a § 1404(a) motion to transfer venue "requires a two-part inquiry: first, whether the action to be transferred might have been brought in the transferee court; and second, whether considering the convenience of the parties and witnesses, and the interest of justice, a transfer is appropriate." *Fuji Photo Film Co., Ltd. v. Lexar Media Inc.*, 415 F.Supp.2d 370, 373 (S.D.N.Y.2006) (internal quotation marks omitted).

Under the second step of this analysis, elements to be considered include: (1) convenience of the witnesses; (2) convenience of the parties; (3) location of relevant documents and the relative ease of access to sources of proof; (4) the locus of operative facts; (5) availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the comparative familiarity of each district with the governing law; (8) the weight accorded to plaintiff's choice of forum; and (9) judicial economy and the interest of justice. *See Herbert Ltd. P'ship v. Electronic Arts Inc.*, 325 F.Supp.2d 282, 285–86 (S.D.N.Y.2004).

As the defendant and moving party, Offshore bears the burden of demonstrating by a clear and convincing showing that transfer is proper. *See Green-*

*wich Life Settlements Inc. v. ViaSource Funding Grp., LLC,* 742 F.Supp.2d 446, 459 (S.D.N.Y.2010).[7] That said, district courts have "broad discretion" in deciding whether to transfer an action, and should base their rulings on "notions of convenience and fairness on a case-by-case basis." *Publicker Indus. Corp. v. United States (In re Cuyahoga Equip. Corp.),* 980 F.2d 110, 117 (2d Cir.1992).

### 2. *Analysis*

#### a. *Propriety of the Western District of Louisiana*

■ In considering where an action "might have been brought" for the purposes of § 1404(a), a district court must look solely to the state of affairs at the time the action was commenced. *See Hoffman v. Blaski,* 363 U.S. 335, 342, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960); *Bayer Schera Pharma AG v. Sandoz, Inc.,* No. 08 Civ. 8112, 2009 WL 440381, at *5 (S.D.N.Y. Feb. 18, 2009). In other words, subject matter jurisdiction, personal jurisdiction and venue all must have been proper in the proposed transferee court at the time the action was filed. *See Ivy Soc'y Sports Grp., LLC v. Baloncesto Superior Nacional,* No. 08 Civ. 8106, 2009 WL 2252116, at *3 (S.D.N.Y. July 28, 2009).

Consequently, in the context of this maritime action, the Court must determine whether, at the time this action was filed, (1) the Defendants would have been subject to personal jurisdiction in the Western District of Louisiana and (2) venue would have been proper in the Western District of Louisiana.

■ A federal court generally may exercise personal jurisdiction to the same extent as courts of general jurisdiction of the state in which the federal court sits. *See* Fed.R.Civ.P. 4(k)(1)(A). "The limits of the Louisiana long-arm statute are coextensive with constitutional due process limits." *Jackson v. Tanfoglio Giuseppe, S.R.L.,* 615 F.3d 579, 584 (5th Cir.2010). Under Fifth Circuit law, general jurisdiction may be found where a "defendant's contacts with the forum state are substantial, continuous, and systematic." *Id.* (*citing Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 415, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)), This test may be satisfied where a defendant maintains "a business presence *in* the forum state." *Id.* Alternatively, specific jurisdiction under Louisiana law may be found where (1) the defendant has minimum contacts with the forum state; (2) the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) the exercise of personal jurisdiction is fair and reasonable. *Id.* at 585.

■ Here, Offshore is a Louisiana corporation whose sole place of business and primary business dealings are in Louisiana. Thus, Offshore would have been subject to general personal jurisdiction in the Western District of Louisiana. Similarly, Smith Maritime is a Florida corporation that, according to Offshore's Motion, maintains substantial, continuous and systematic contacts in Louisiana through the presence of two facilities in Morgan City, Louisiana.[8] Even were that not the case, Smith Maritime contracted with Associated to transport the Cargo from Louisiana to Nigeria and, by the time this action was filed, actually did transport the

---

7. Although Smith Maritime indicated during the January 7 Conference that it no longer supports transfer, the Court draws from facts asserted in the Smith Maritime Letter in ruling upon Offshore's Motion for venue transfer.

8. This assertion as to Smith Maritime's presence in Louisiana was made in the Offshore Mem., however, and was not properly supported by citation to the testimony of any declaring witness.

Cargo out of Louisiana's waters. As AGCS's claims under the Cargo Policy arise out of and result from those business dealings in Louisiana, the Court finds that Smith Maritime would be subject to specific personal jurisdiction in Louisiana and that the exercise of such jurisdiction would have been fair and reasonable.

Finally, Associated's extended negotiations with Louisiana-based Offshore, as well as its agreements under the Purchase Agreement and Transport Agreement to purchase the Cargo located in Louisiana and have it shipped out of Louisiana to Nigeria, suffice to establish minimum contacts from which this lawsuit arises. Of significance to this analysis, (1) Associated negotiated with Offshore for over a year both from Nigeria and through brokers in Louisiana; (2) at all times up until they were transported out of Louisiana waters, the lift boats were located in Louisiana; and (3) the Purchase Agreement's choice of law provision identifies both Louisiana and federal Maritime Law as its governing laws and contains a forum selection clause specifying venue in the Eastern and Middle Districts of Louisiana for disputes arising therefrom. (*See* Offshore Mem. Ex. 1 ¶¶ 5–8, 10.) Therefore, the Court holds that the Western District of Louisiana would have had personal jurisdiction over all three Defendants at the time this action was filed.

By the same reasoning, venue also would have been proper in the Western District of Louisiana under §§ 1391(b)(1) and (2) at the time this action was filed. At least one defendant—Smith Maritime— resides in that District, and, as discussed above, all Defendants are deemed to reside in Louisiana pursuant to 28 U.S.C. §§ 1391(c) and (d). In addition, a substantial part of the events or omissions giving rise to the claim—namely the purchase and transport of the Cargo—occurred there.

Therefore, the Court concludes that this action could have been brought originally in the Western District of Louisiana.

#### b. *Transfer Factors*

##### i. *Convenience of Witnesses*

■ The convenience of witnesses is typically the most important factor when considering a motion to transfer. *See Herbert,* 325 F.Supp.2d at 286; *Hubbell Inc. v. Pass & Seymour, Inc.,* 883 F.Supp. 955, 962 (S.D.N.Y.1995) ("The core determination under § 1404(a) is the center of gravity of the litigation, a key test of which is the convenience of witnesses."). In assessing this factor, a court "must qualitatively evaluate the materiality of the testimony that the witnesses may provide." *Herbert,* 325 F.Supp.2d at 286. Not surprisingly, AGCS and Offshore disagree as to which District is more convenient for the material witnesses to this action.

■ Offshore argues that adjudicating AGCS's claims regarding abandonment, Demurrage charges and sue and labor will require testimony concerning the extent of damage to the boats in transit; the cost of repairs; the feasibility of repairs in Nigeria; and the prudence of the decisions made by AOG, including the decision to divert the Flotilla from Trinidad back to Louisiana. According to Offshore, key witnesses will therefore include: marine surveyors located in Louisiana, Texas and Trinidad; Offshore's principals, who have extensive knowledge of the type of equipment at issue, and who are located in Louisiana; employees of the Louisiana shipyards where the Cargo is currently under repair; and experts, presumably from Nigeria, who are knowledgeable about the ability of Nigerian shipyards to repair vessels of the nature of the Cargo.

In contrast, AGCS asserts that this action amounts to little more than a contract

dispute necessitating testimony concerning "formation, modification, construction and operation" of the Cargo Policy. (AGCS Letter at 3.) The AGCS Letter argues that the witnesses most material to this action are its own underwriting and claims personnel, all of whom are located in New York. To the extent that witnesses from locations outside New York—such as Nigeria, Louisiana, Texas and Trinidad—are required, AGCS argues that in the aggregate, air travel to New York is both faster and less expensive than travel to the Western District of Louisiana courthouse in Lafayette, Louisiana.

The Court is not persuaded by AGCS's contention that this action involves a simple matter of contract interpretation. Rather, the Court finds that a not-insignificant amount of testimony by witnesses located primarily in the Gulf region may be crucial to the various questions of fact that are likely to arise in this litigation. Consequently, the convenience of witnesses factor weighs in favor of Louisiana.

### ii. Convenience and Relative Means of the Parties

 "The relative means of the opposing parties may-support or discourage transfer of venue if there is a significant financial disparity between the parties." *Herbert*, 325 F.Supp.2d at 290. Here, both Offshore and Smith Marine are relatively small companies based in Louisiana and Florida, with limited staff and financial resources available for litigating in this District. By contrast, according to Offshore and the Smith Maritime Letter, AGCS is the marine division of one of the world's largest insurance companies, and has 450 specialist marine staff throughout the United States and the world. AGCS does not dispute this assertion. Consequently, the convenience of the parties, when considered in conjunction with the relative means of the parties, weighs in favor of transfer.

### iii. Location of Relevant Evidence

 Offshore argues that the principal evidence in this case is the Cargo itself, which is currently located in Louisiana waters near Morgan City, Louisiana. To the extent that fact or expert witness testimony is relevant to the claims asserted, those witnesses will necessarily have to inspect the Cargo in Louisiana. AGCS has not offered any counterarguments sufficient to persuade the Court that other evidence exists in this District which would, by reason of the current location of the Cargo, overcome the weight of Louisiana's convenience as a forum. Consequently, this factor also weights in favor of transfer to Louisiana.

### iv. Locus of Operative Facts

 In an action arising out of a contract, the location of the operative facts is "where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred." *Oubre v. Clinical Supplies Mgmt., Inc.*, No. 05 Civ. 2062, 2005 WL 3077654, at *4 (S.D.N.Y. Nov. 17, 2005). The relevant events in this matter appear to have transpired in a variety of locations. While AGCS may argue that the Cargo Policy was agreed to and issued from New York City, it is not clear whether or to what extent New York was the site of negotiation. By contrast, the key events relating to the Cargo Policy's alleged breach and abandonment occurred (1) in Morgan City, Louisiana, where the Cargo was loaded onto the Flotilla and where it has returned for servicing; (2) in St. Thomas and Trinidad, where the Flotilla was diverted for temporary repairs; and (3) on the high seas off the coast of Africa, where the Cargo became damaged and the Flotilla was diverted back to Trinidad and ultimately Louisiana. Consequently, it cannot be said that the factual gravity of this

action favors this District over the Western District of Louisiana.

### v. Comparative Familiarity of Each District with Governing Law

The Cargo Policy contains a provision stating that it is subject to English law and practice, and undoubtedly much of the remaining procedural and substantive law will be supplied in accordance with United States Maritime Law. Both the Southern District of New York and the Western District of Louisiana possess ample experience interpreting the latter, and there is no reason to believe that either District possesses greater facility in resolving conflicts that may arise through its interplay with the former. *See, e.g., Lenfest v. Coldwell,* 525 F.2d 717, 724 n. 15 (2d Cir.1975) ("English and American law of marine insurance have developed on rather similar lines. It is a general rule in this country ... that American courts will look to British law for definition in this field."); *see also, e.g., Liverpool & London S.S. Prot. & Indent. Ass'n Ltd. v. QUEEN OF LEMAN MV,* 296 F.3d 350, 352–54 (5th Cir. 2002) (resolving conflict between United States maritime law and English law). Consequently, this consideration does not weigh in favor of either district.

### vi. Weight Accorded to Plaintiff's Choice of Forum

 Finally, while plaintiff's choice of forum is ordinarily accorded relatively greater importance than the other elements in the transfer analysis, this weight changes when the operative facts have few meaningful connections to the plaintiff's chosen forum. *See Kreinberg v. Dow Chem. Co.,* 496 F.Supp.2d 329, 330 (S.D.N.Y.2007). As discussed above, the center of gravity of this action occurred in locations primarily outside of this District. Given the Court's findings regarding the convenience of the witnesses and parties and the location of relevant evidence in

Louisiana, AGCS's choice of this District should not receive the level of deference normally accorded to a plaintiff's choice of forum. *See Fuji Photo Film Co.,* 415 F.Supp.2d at 376.

### c. Conclusion

For the reasons described above, the Court is persuaded that in the interest of justice, the maximum convenience to the parties and witnesses, and the efficient management of this Court's docket, this action should be transferred to the Western District of Louisiana.

## B. OFFSHORE'S DISMISSAL MOTIONS

Offshore also moves (1) to be dismissed from this action on the basis that the Court lacks personal jurisdiction over Offshore, and (2) to dismiss the entire action for improper venue. Because the Court finds that this action should be transferred to the Western District of Louisiana, it need not address these remaining motions.

### III. ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion (Docket No. 17) of defendant Offshore Marine, Inc. is granted in part; and it is further

**ORDERED** that the Clerk of Court is directed to transfer this case to the Western District of Louisiana pursuant to 28 U.S.C. § 1404(a), and to terminate any pending motions and to close this case.

**SO ORDERED.**